**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
    ehorne@bursor.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRED KUECK and JASEN SILVER, individually and on behalf of all others similarly situated, | Case No. |
|           Plaintiffs, | **CLASS ACTION COMPLAINT** |
|   v. | <u>JURY TRIAL DEMANDED</u> |
| NESTLÉ PURINA PETCARE COMPANY, | |
|        Defendant. | |

Plaintiffs Fred Kueck and Jasen Silver ("Plaintiffs") bring this action on behalf of themselves, and all others similarly situated against Nestlé Purina PetCare Company ("Purina" or "Defendant").  Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Plaintiffs bring this class action lawsuit on behalf of themselves and similarly situated consumers ("Class Members") who purchased Purina-branded pet food[1] (the "Products").  The Products are labeled as healthy, yet the packaging contains per-and polyfluoroalkyl substances ("PFAS").  PFAS are synthetic chemicals that pose undue health risks, even at low levels.  Accordingly, the presence of PFAS renders Defendant's healthy representations false and misleading.

2.      Laboratory studies have shown that PFAS exposure raises a host of health effects, such as various cancers, liver damage, and immunotoxicity effects.  Because of the concerns presented by PFAS, consumers—like Plaintiffs—care about their presence, even if in small amounts.

3.      Defendant nonetheless consistently makes various misrepresentations concerning the Products to convince consumers that the Products are healthy for consumption and do not expose pets to heightened health risks.  Defendant knew, or should have known, that PFAS are unhealthy and raise health risks because "the dangers of PFAS are well known" to the point where "public demand is leading to a growing market for PFAS-free products."[2]

4.      Moreover, Defendant fails to inform consumers that the Products contain PFAS and implications of consuming PFAS.  The inadequate labeling means that consumers who purchase

---

[1] Those products include, but are not limited to, all varieties of Cat Chow: Cat Chow Complete Chicken, Cat Chow Complete Salmon, Cat Chow Gentle, Cat Chow Senior, Cat Chow Indoor, Cat Chow Naturals Indoor, Cat Chow Naturals Original, Kitten Chow Nurture, Kitten Chow Naturals.

[2] Jeffrey Kluger, *Companies Knew the Dangers of PFAS 'Forever Chemicals'—and Kept Them Secret*, TIME (June 1, 2023), https://time.com/6284266/pfas-forever-chemicals-manufacturers-kept-secret/.

Defendant's Products are unaware that their pets are at heightened risk of an array of health effects from PFAS.

5.      Based on Defendant's omission, a reasonable consumer would expect that the Products are healthy and can be purchased and consumed as marketed and sold.  Yet, Defendant does not notify consumers, like Plaintiffs, that the Products are not healthy, pose health risks, and should otherwise be approached with caution.

6.      Accordingly, Plaintiffs bring their claims against Defendant individually and on behalf of a class of all others similarly situated for (1) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; (2) violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; (3) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*; (4) Fraud; (5) Fraudulent Omission or Concealment; and (6) Unjust Enrichment.

## PARTIES

7.      Plaintiff Fred Kueck is a natural person and citizen of California who resides in Bay Point, California.  Mr. Kueck has long been interested in providing his pets with healthy food that would not expose his pets to harmful chemicals or other substances.  Mr. Kueck specifically set out to purchase products with those characteristics.  Mr. Kueck did so because he cares about the presence of harmful substances even if in small amounts.

8.      Due to Mr. Kueck's interest in doing so, Mr. Kueck purchased Purina Cat Chow Complete Chicken several times, including from Walmart in Pittsburg, California as well as PetSmart in Concord, California.  Mr. Kueck's most recent purchase was in approximately September 2023.  Prior to his purchase, Mr. Kueck reviewed the labeling, packaging, and marketing materials of the products and saw the false and misleading claims that, among other things, the Products are healthy for animal consumption.

9.      Mr. Kueck understood these claims to be representations and warranties by Defendant, that the Products are free from harmful ingredients and would indeed support—not detract from—the health of his pets.  Mr. Kueck reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations were part of the basis of

the bargain in that he would not have purchased the Products or would not have purchased them on the same terms, if the true facts about their contents had been known.  As a direct result of Defendant's material misrepresentations and omissions, Mr. Kueck suffered, and continues to suffer, economic injuries.

10. Plaintiff Jasen Silver is a natural person and citizen of California who resides in San Jose, California.  Mr. Silver has long been interested in providing his pets with healthy food that would not expose his pets to harmful chemicals or other substances.  Mr. Silver specifically set out to purchase products with those characteristics.  Mr. Silver did so because he cares about the presence of harmful substances even if in small amounts.

11. Due to Mr. Silver's interest in doing so, Mr. Silver has purchased Purina Cat Chow Complete Chicken several times, most recently from Safeway in San Jose, California in September 2023.  Prior to his purchase, Mr. Silver reviewed the labeling, packaging, and marketing materials of the products and saw the false and misleading claims that, among other things, the Products are healthy for animal consumption.

12. Mr. Silver understood these claims to be representations and warranties by Defendant, that the Products are free from harmful ingredients and would indeed support—not detract from—the health of his pets.  Mr. Silver reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations were part of the basis of the bargain in that he would not have purchased the Products or would not have purchased them on the same terms, if the true facts about their contents had been known.  As a direct result of Defendant's material misrepresentations and omissions, Mr. Silver suffered, and continues to suffer, economic injuries.

13. Plaintiffs remain interested in purchasing pet food made by Defendant that is healthy for their pets and safe for consumption.  However, Plaintiffs are unable to determine if the Products are actually healthy for consumption.  Plaintiffs understand that the composition of the Products may change over time.  But so long as Defendant may market the Products as healthy for consumption when the Products are not healthy and pose health risks, then when presented with false or misleading information when shopping, they will be unable to make informed decisions

1  about whether to purchase Defendant's Products and will be unable to evaluate the different prices

2  between Defendant's Products and competitor's products.  Plaintiffs are further likely to be

3  repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that

4  Products marketed and labeled as healthy for consumption, are, in fact, healthy for consumption.

5       14.   Defendant, Purina, is a Missouri corporation with headquarters in Saint Louis,

6  Missouri.  Defendant advertises, markets, manufactures, distributes, and sells the Products

7  throughout the United States, including in the State of California.  Defendant manufactured,

8  marketed, and sold the Products during the Class Period.

9                          **JURISDICTION AND VENUE**

10      15.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as

11  amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action

12  where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00,

13  exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiffs, as

14  well as most members of the proposed class, are citizens of a different state than Defendant.  This

15  Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

16      16.   This Court has personal jurisdiction over Defendant because Defendant

17  purposefully availed itself of this forum by conducting substantial business within California such

18  that Defendant has significant, continuous, and pervasive contacts with the State of California.

19      17.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant

20  does substantial business in this District, a substantial part of the events giving rise to Plaintiffs'

21  claims took place within this District, and Plaintiffs were subject to Defendant's advertisements in

22  this District.

23                          **FACTUAL ALLEGATIONS**

24  A.    **The Presence Of PFAS Renders Healthy Representations Misleading**

25      18.   The Environmental Working Group ("EWG") commissioned an independent

26  laboratory to test the packaging for various pet food products, including Defendant's Cat Chow

27

28

Complete Chicken Product.[3]  The total fluorine test—an industry standard to determine the presence of PFAS—found that Defendant's packaging[4] contains levels of organic fluorine indicative of PFAS as well as various named PFAS.[5]

19.     Specifically, EWG's laboratory results showed that the packaging contained a total fluorine count of 310 parts per million ("ppm") and named PFAS in the amount of 244.7 parts per billion ("ppb"), which was the "**highest concentration of total PFAS**"[6] out of all products tested.[7]

20.     Indeed, no other pet food bag had more than 15 ppb of total PFAS, whereas Defendant's Cat Chow Complete Chicken Product had 244.7 ppb of total PFAS,[8] an amount that the EWG termed "alarming."[9]

---

[3] Sydney Evans & Anthony Lacey, *Quibble with Kibbles: 'Forever chemicals' in pet food packaging add to perils at home'*, EWG (Nov. 3, 2022), https://www.ewg.org/news-insights/news/2022/11/quibble-kibbles-forever-chemicals-pet-food-packaging-add-perils-home (emphasis added).  Defendant has not substantially or meaningfully altered the components comprising the Products' packaging within the past several years.  Because the packaging for the Products is still comprised of similar and unaltered components, and some have tested for PFAS, it is highly likely that the packaging of all of Defendant's Products are comprised of certain named PFAS.

[4] Defendant has not substantially or meaningfully altered the components comprising the Products' packaging within the past several years.  Because the packaging for the Products is still comprised of similar and unaltered components, and some have tested for PFAS, it is highly likely that the packaging of all of the Defendant's Products at issue are comprised of certain named PFAS.

[5] *Supra* note 3; *Short Guide to Common Testing Methods for Per and Polyfluoroalkyl Substances (PFAS)*, BizNGO (2020), https://www.bizngo.org/images/ee_images/uploads/resources/CFE_PFAS_Testing_FactSheet_Final.pdf (stating that, "[t]otal fluorine techniques measure either total organic fluorine or total fluorine. These techniques are efficient ways to identify whether PFAS are likely present"); Kevin Loria, *Dangerous PFAS Chemicals Are in Your Food Packaging*, Consumer Reports (Mar. 24, 2023), https://www.consumerreports.org/health/food-contaminants/dangerous-pfas-chemicals-are-in-your-food-packaging-a3786252074/ (detailing that they "tested products for their total organic fluorine content, which is considered the simplest way to assess a material's total PFAS content").

[6] *Supra* note 3.

[7] *Id.*; Arabela Ramírez Carnero, Antía Lestido-Cardama, Patricia Vazquez Loureiro, Letricia Barbosa-Pereira & Ana Rodríguez Bernaldo de Quirós, Raquel Sendón, *Presence of Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS) in Food Contact Materials (FCM) and Its Migration to Food*, 10 Foods 1, 5 (2023) https://doi.org/10.3390/foods10071443.

[8] *Supra* note 3.

[9] Monica Amarelo, *New tests find toxic "forever chemicals" in pet food bags and baby textiles*, EWG (Nov. 3, 2022), https://www.ewg.org/news-insights/news-release/2022/11/new-tests-find-toxic-forever-chemicals-pet-food-bags-and-baby.

21.     Just as troubling, the test results showed that Defendant's Cat Chow Complete Chicken Product "**was contaminated with six different PFAS**[.]"[10]

22.     The amount of fluorine — 310 ppm — found in the Product's packaging further supports that Defendant knew or should have known about the presence of PFAS in its' Products. Although "trace amounts of fluorine naturally occur in the environment, high levels prove that a product was intentionally manufactured using PFAS."[11]  Rainier Lohmann, Director of the University of Rhode Island's Lohmann Lab has explained that "[i]f a product is showing really high fluorine levels, companies really can't claim they didn't use PFAS."[12]

23.     Recent legislation[13] has been in line with the above findings.  New York, Washington, Vermont, Connecticut, Colorado, Maryland, Minnesota, Rhode Island, and Hawaii have banned the intentional use of PFAS in food packaging.  California not only banned the intentional use of PFAS in food packaging, but also banned food packaging that exceeds 100 ppm total organic fluorine.[14]

24.     These legislation enactments make sense as researchers have also established that PFAS are mobile and readily migrate from food contact articles ("materials intended to come into

---

[10] *Id.* (emphasis added).

[11] Joe Fassler, *The bowls at Chipotle and Sweetgreen are supposed to be compostable. They contain cancer-linked "forever chemicals,"* THE COUNTER (Aug. 5, 2019), https://thecounter.org/pfas-forever-chemicals-sweetgreen-chipotle-compostable-biodegradable-bowls/.

[12] *Id.*; *See also* BPI, *Fluorinated Chemicals*, https://bpiworld.org/fluorinated-chemicals (last visited Oct. 24, 2023) (stating that the BPI Certification Scheme requires that BPI Certified items not contain more than 100ppm of total organic fluorine); Loria, *supra* note 5 (noting that starting January 2023, California has banned intentional addition of PFAS and that paper food packaging must have less than 100 ppm of organic fluorine).

[13] Similarly, the U.S. Environmental Protection Agency ("EPA") has found that PFAS can cause harm at levels "much lower than previously understood" and that almost no level of exposure is safe.  Lisa Freidan, *Biden Administration to Restrict Cancer Causing 'Forever Chemicals,'* NYT (June 22, 2023), https://www.nytimes.com/2023/03/14/climate/epa-water-pfas-chemicals.html. The EPA advises that drinking water should contain no more than 4 parts per trillion of PFAS; whereas, previously, the EPA advised drinking water contain no more than 70 parts per trillion.

[14] Loria, *supra* note 5 (noting that starting January 2023, California has banned intentional addition of PFAS and that paper food packaging must have less than 100 ppm of organic fluorine).

contact with food during its transport, storage, conservation, handling or manufacture") onto food.[15]

25.     PFAS migrating onto food is paramount because of the health risks raised by PFAS.[16]

26.     Indeed, PFAS are "resistant to environmental and metabolic degradation" which leads to "build up" in the bodies of those exposed to PFAS.[17]  As a result, "[e]xposure to certain PFAS may lead to detrimental health impacts including reproductive effects, developmental effects, increased risks of cancers, weakening of the immune system, and endocrine system disruption."[18]

27.     Critical to the present facts, animal studies have found that PFAS can cause, among other serious health effects, cancer, physical development delays, endocrine system disruption, liver and pancreatic tumors, thyroid disease, kidney disease, and reproductive disease.[19]

---

[15] Loria, *supra* note 5; Alan Ducatman, Jonas LaPier, Rebecca Fuoco & Jamie C. DeWitt, *Official health communications are failing PFAS-contaminated communities*, ENV'T. HEALTH (2022), doi: 10.1186/s12940-022-00857-9 (stating that "[b]ecause of widespread use, as well as their mobility and persistence, most humans have detectable internal PFAS contamination from multiple sources, notably food [and] food contact materials").

[16] *See Time for Action to End PFAS Threat*, UNION OF CONCERNED SCIENTISTS (June 13, 2019), https://www.ucsusa.org/resources/pfas-threat#:~:text=in%20their%20water.- ,PFAS%20health%20impacts,%2Dinduced%20hypertension%2Fpre%2Declampsia (calling for the EPA "act now to protect communities from a highly toxic class of chemicals known as PFAS," and describing PFAS as being "associated with many serious illnesses, including cancers and reproductive disorders").

[17] *Research for Understanding PFAS Uptake and Bioaccumulation in Plant and Animals in Agricultural, Rural, and Tribal Communities Request for Applications (RFA)*, EPA (2023) 1, 2, https://www.epa.gov/system/files/documents/2023-10/fy23-star-epa-usda-pfas-rfa-october-2023-final.pdf; Phillip C. Bost, Mark J. Strynar, Jessica L. Reiner, Jerry A. Zweigenbaum, Patricia L. Secoura, Andrew B. Lindstrom & Janice A. Dye, *U.S. domestic cats as sentinels for perfluoroalkyl substances: Possible linkages with housing, obesity, and disease*, 151 ENV'T. RSCH. (2016) 145, https://doi.org/10.1016/j.envres.2016.07.027 (stating that PFAS are "resistant to biodegradation processes").

[18] EPA, *supra* note 17.

[19] Kellyn S. Betts, *Perfluoroalkyl Acids: What is the Evidence Telling Us?*, ENV'T. HEALTH PERSPECTIVES (2007), A250, https://doi.org/10.1289/ehp.115-a250; Michigan PFAS Response Team, *PFAS and Pets and Livestock Health*, STATE OF MICH., https://www.michigan.gov/pfasresponse/faq/categories/pfas-and-pets-and-livestock-health; Heather D.Brake, Antonia Langfeldt, John B. Kaneene & Melinda J.Wilkins, *Current per- and polyfluoroalkyl substance (PFAS) research points to a growing threat in animals*, 261 J. AM. VETERINARY MED. ASS'N. (2023) 952, 955, https://doi.org/10.2460/javma.22.12.0582.

---

**B.** **Defendant's Misrepresentations And Omissions Are Actionable**

28. Defendant has endangered consumers' pets by exposing them to PFAS, which Defendant knows, or should have known, carries significant health concerns. Even though the Products' packaging contains the harmful ingredient, Defendant represents that the Products are healthy for animals.

29. For example, the Cat Chow Complete Chicken Product has various representations that indicate the Product is healthy for cats. Notably, the front of the bag explicitly states that the Product is "100% complete & balanced for all life stages" and contains the "cornerstones of nutrition": such as "all 25 essential vitamins & minerals," "omega-6 fatty acids for shiny coat," "healthy carbs for vital energy," and "high-quality protein for strong muscles":





30.   Defendant further represents that the Cat Chow Complete Chicken Product is "formulated to help cats live a long, healthy life" and "helps support a healthy immune system":



31.   Defendant makes these healthy representations on all of its Cat Chow Products.[20] For example, each Product's bag represents that the food is "100% Complete & Balanced."  Some Products' bags include the "all 25 essential vitamins & minerals" representations.  Others include representations regarding the inclusion of "Omega-6 Fatty Acids" to "Nourish Skin and Coat":

---

[20] *Supra* note 1.






1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16      32.     Defendant's Purina Cat Chow Naturals Products similarly make healthy

17   representations.  For example, all of Purina Cat Chow Naturals Products make additional healthy

18   representations such as, "with added vitamins, minerals & nutrients," "0% Fillers,"[21] and "No

19   Artificial Colors, Flavors, or Preservatives."

20
21
22
23
24
25
26

27   _____

28   [21] Ken Tudor, *What You Need to Know About Fillers in Dog Food*, HEARTHSTONE HOMEMADE,
     https://www.hearthstonehomemadedogfood.com/blog/what-you-need-to-know-about-fillers-in-
     dog-food (defining fillers in dog food as "an ingredient that adds bulk to a diet without adding any
     nutritional value") (last visited Oct. 25, 2023).

1
2
3
4
5
6
7
8
9
10
11
12
13
14

 

15
16
17
18
19
20
21
22
23
24
25
26
27
28



33.   Moreover, Defendant publicly promises consumers "quality in [its] production processes" and states it follows through with that promise by "comply[ing] and exceed[ing] all national regulations.[22]  Defendant employs a "four-fold strategy to ensure that its products are safe for animals, people, and the environment."[23]  Its "prevention-based approach is designed to manage regulatory compliance and anticipate public concerns with current and future products and operations."[24]

34.   Additionally, Defendant states that it conducts "more than 100,000 quality and safety checks daily across its entire footprint, integrated into each step of the process."[25]  Out of those 100,000 plus checks, more than "4,600 quality checks" are conducted "during packaging."[26]

35.   Defendant operates microbiology and chemistry labs where a "team of four employees" does a daily review of "the results from all quality and safety tests … before product is released for distribution."[27]  Thus, Defendant knew, or should have known, the Products contain PFAS, the health impact PFAS poses for animals, and how the negative impact of PFAS makes the healthy claims false.

36.   In summary, Plaintiffs saw Defendant's representations and appreciated that these representations meant that the Products were healthy for their cats.  Plaintiffs would not have purchased these Products absent their desire to provide healthy nutrition for their cats.  Defendant misrepresents that these Products are healthy and omits the fact that the Products contain PFAS— an unhealthy and synthetic chemical, that has been found to pose health risks to animals.  As a result, Plaintiffs and the Class were injured by the full purchase price of the Products because the Products are worthless, as they are marketed as healthy for animal consumption when they are not.

---

[22] PURINA, https://purina.com.jm/purina/know-purina/quality (last visited Oct. 16, 2023).

[23] U.S. Department of Commerce, *Nestlé Purina PetCare Company: Malcolm Baldrige National Quality Award 2010 Award Recipient*, MANUFACTURING NAT'L. INST. STANDARDS TECH., https://www.nist.gov/baldrige/nestle-purina-petcare-company (last visited Nov. 2, 2023).

[24] *Id.*

[25] Jennifer Semple, *Pet Food Processing goes 'Behind the Bowl' at Purina production plant*, PET FOOD PROCESSING (Mar. 6, 2019) https://www.petfoodprocessing.net/articles/12967-pet-food-processing-goes-behind-the-bowl-at-purina-production-plant.

[26] *Id.*

[27] *Id.*

In the alternative, Plaintiffs and the Class were injured by the premium in price they paid for the Products as a result of the Products being advertised and represented as healthy, when they were not due to the presence of PFAS.

37.   Plaintiffs and Class Members bargained for products that are healthy for consumption and were deprived of the basis of their bargain when Defendant sold them Products in packaging containing PFAS, heightening the risks of serious negative health effects.  No reasonable consumer would expect that the Products marketed as containing the "cornerstones of nutrition" such as "all 25 essential vitamins & minerals," "omega-6 fatty acids for shiny coat," "healthy carbs for vital energy," and "high-quality protein for strong muscles" as well as being "formulated to help cats live a long, healthy life" would pose a risk to their pets' health, safety, and well-being.

38.   Nor would a reasonable consumer expect the Products, represented as healthy, to contain PFAS, which are linked to harmful health effects in animals—such as cancer, physical development delays, endocrine disruption, liver and pancreatic tumors, thyroid disease, kidney disease, and reproductive disease.[28]  Accordingly, Plaintiffs and Class Members suffered economic injuries as a result of purchasing the Products.

39.   Moreover, because these facts relate to a critical safety-related deficiency in the Products, Defendant was under a continuous duty to disclose to Plaintiffs and Class Members the true standard, quality, and grade of the Products and to disclose that the Products contained, or risked containing, substances known to have adverse health effects.  Defendant also had a duty to disclose because of its exclusive and/or superior knowledge concerning the true nature of the Products.  Nonetheless, Defendant concealed and misrepresented this information, as discussed herein.

40.   Although Defendant is in the best position to know what content it placed on its packaging during the relevant timeframe, and the knowledge that Defendant had regarding the

---

[28] *Supra* note 16.

presence of PFAS that rendered its representations misleading, to the extent necessary, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

41.     **WHO**:  Defendant made material misrepresentations and omissions of fact about the Products through its labeling which shows that the Products are healthy.  These representations constitute omitted material information regarding harmful chemicals (PFAS).

42.     **WHAT**:  Defendant's conduct here was, and continues to be, fraudulent because it omitted and concealed that the Products contain PFAS—which are widely known to have significant health repercussions.  Thus, Defendant's conduct deceived Plaintiffs and Class Members into believing that the Products are healthy for animal consumption when they are not. Defendant knew or should have known that this information is material to reasonable consumers, including Plaintiffs and Class Members in making their purchasing decisions, yet it continued to pervasively market the Products in this manner in the U.S. market to convince consumers the Products are healthy for pets.

43.     **WHEN**:  Defendant made material misrepresentations and omissions during the putative class periods, including prior to and at the time Plaintiffs and Class Members purchased the Products, despite its knowledge that the Products contained PFAS, harmful substances with known adverse health effects.

44.     **WHERE**:  Defendant's marketing messages were uniform and pervasive, carried through material misrepresentations and omissions on the labeling of the Products' packaging, website, and through marketing materials.

45.     **HOW**:  Defendant made material misrepresentations and omissions of fact regarding the Products, including the presence of PFAS in the Products.

46.     **INJURY**:  Plaintiffs and Class Members purchased, paid a premium (up to the full-price), or otherwise paid more for the Products when they otherwise would not have absent Defendant's misrepresentations and omissions.

## CLASS ALLEGATIONS

47.     ***Class Definition.***        Plaintiffs bring this action on behalf of a class of similarly situated individuals, defined as all persons in the United States who purchased the Products during

the applicable statute of limitations period (the "Class").  Excluded from the Class are persons who made such purchase for purpose of resale, Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, and members of the judge's staff, and the judge's immediate family.

48.     Plaintiffs also seek to represent a subclass consisting of Class members who purchased the Products in California during the applicable statute of limitations period (the "California Subclass" or "Subclass").

49.     Plaintiffs reserve the right to amend the definition of the Class and Subclass if discovery or further investigation reveals that the Class or Subclass should be expanded or otherwise modified.

50.     ***Numerosity.***    Members of the Class and Subclass are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class and Subclass number in the hundreds of thousands.  The precise number of Class and Subclass Members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Class and Subclass Members may be notified of the pendency of this action by mail and/or publications through the distribution records of Defendant and third-party retailers and vendors.

51.     ***Commonality and Predominance.***  Common questions of law and fact exist as to all Class and Subclass Members and predominate over questions affecting only individual Class Members.  Common legal and factual questions include but are not limited to: (1) whether Defendant warranted the Products as safe for animal consumption; (2) whether Defendant warranted the Products as healthy for animals; (3) whether Defendant breached these warranties; and (4) whether Defendant committed the statutory and common law violations alleged against it herein by doing so; and (5) whether the Products contain PFAS.

52.     ***Typicality.***      Plaintiffs' claims are typical of the claims of the Class and Subclass in that Plaintiffs purchased Defendant's Products in reliance on the presentations and warranties described above and suffered a loss as a result of that purchase.

53.   **_Adequacy._**   Plaintiffs are adequate representatives of the Class and Subclass because their interests do not conflict with the interests of the Class or Subclass Members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the Class and Subclass Members will be fairly and adequately protected by Plaintiffs and their counsel.

54.   **_Superiority._**   The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class and Subclass Members.  Individually, Class and Subclass Members may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense of all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of the case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issue will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

55.   Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class and Subclass as a whole.

56.   Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiffs and members of the Class and will likely retain the benefits of its wrongdoing.

57.   Based on the foregoing allegations, Plaintiffs' claims for relief include those set forth below.

**COUNT I**
**Violation of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200, _et seq_.**
**(On Behalf Of The California Subclass)**

58.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

59.     Plaintiffs bring this claim individually and on behalf of the Subclass against Defendant.

60.     California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."  For the reasons discussed above, Defendant has engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

61.     By committing the acts and practices alleged herein, Defendant has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210 by engaging in unlawful, fraudulent, and unfair conduct.

62.     Defendant has violated the UCL's proscription against engaging in **Unlawful Business Practices** as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as alleged below, violations of California's False Advertising Law, in addition to violations of common law.

63.     As more fully described above, Defendant's misleading marketing, advertising, packaging, and labeling of the Products are likely to deceive reasonable consumers.  In addition, Defendant has committed unlawful business practices by, inter alia, making the representations and omissions of material facts, as set forth more fully herein, and violating the common law.

64.     Plaintiffs and the Class Members reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

65.     Defendant has also violated the UCL's proscription against engaging in **Unfair Business Practices**.  Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq.* in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

66.     There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein as noted above.

67.     Defendant has further violated the UCL's proscription against engaging in **Fraudulent Business Practices**.  Defendant's claims, nondisclosures, and misleading statements with respect to the Products, as more fully set forth above, were false, misleading, and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

68.     Plaintiffs and the other Subclass Members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Products.

69.     There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Products.

70.     Plaintiffs and the other Subclass Members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled.  Thus, they could not have reasonably avoided the injury each of them suffered.

71.     The gravity of the consequences of Defendant's conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiffs and the other Subclass Members.

72.     Pursuant to California Business and Professional Code § 17203, Plaintiffs and the Class seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiffs and the other Subclass Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiffs' attorneys' fees and costs.

<u>**COUNT II**</u>
**Violation of California's Consumers Legal Remedies Act ("CLRA"),**
**California Civil Code § 1750, *et seq.***
**(On Behalf Of The California Subclass)**

73.     Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

74.     Plaintiffs bring this claim individually and on behalf of the Subclass against Defendant.

75.     Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

76.     Civil § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

77.     Civil § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

78.     Defendant violated Civil Code § 1770(a)(5), (a)(7), and (a)(9) by holding out the Products as healthy when in fact the Products are not healthy.

79.     The Products are not healthy because their packaging contain PFAS.

80.     Defendant failed to disclose that the Products packaging contain PFAS.

81.     Defendant has exclusive and/or superior knowledge of the health risks of the Products, which was not known to Plaintiffs or Subclass Members.

82.     Defendant made partial misrepresentations to Plaintiffs and Subclass Members, while suppressing the true nature of the Products.  Specifically, by displaying the Products and describing the Products as healthy, including on the product packaging, on its website, and in its marketing, without disclosing that the Products were harmful to animal health.  Moreover, Defendant affirmatively misrepresented the Products despite its knowledge that the Products were not as advertised.

83.     Plaintiffs and the Subclass Members have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid and were unknowingly exposed to a significant and substantial health risk.

84.     On September 27, 2023, prior to the filing of this Complaint, Plaintiffs' counsel sent Defendant a CLRA notice letter, which complies in all respects with California Civil Code § 1782(a).  The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA with respect to the presence of PFAS in the Products, and demanding

1    that it cease and desist from such violations and make full restitution by refunding the monies

2    received therefrom.  The letter stated that it was sent on behalf of all other similarly situated

3    purchasers.

4            85.     Defendant Purina failed to remedy the issues raised in the notice letter.

5    Accordingly, Plaintiffs seek damages from Defendant for its violations of the CLRA.

6            86.     Injunctive relief is also appropriate, and indeed necessary, to require Defendant to

7    provide full and accurate disclosures regarding the Products so that Plaintiffs and Subclass

8    Members can reasonably rely on Defendant's representations as well of those of Defendant's

9    competitors who may then have an incentive to follow Defendant's deceptive practices, further

10   misleading consumers.

11                                       **COUNT III**
12                   **Violation of California's False Advertising Law,**
                        **Cal. Bus. & Prof. Code § 17500, *et seq*.**
13                       **(On Behalf Of The California Subclass)**

14           87.     Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

15           88.     Plaintiffs bring this claim individually and on behalf of the Subclass against

16   Defendant.

17           89.     Defendant's acts and practices, as described herein, have deceived and/or are likely

18   to continue to deceive Members of the Subclass and the public.  As described above, and

19   throughout this Complaint, Defendant misrepresented the Products as healthy when, in fact, the

20   Products were not healthy and instead heighten health risks.

21           90.     By its actions, Defendant disseminated uniform advertising regarding the Products

22   to and across California.  The advertising was, by its very nature, unfair, deceptive, untrue, and

23   misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq*.  Such advertisements

24   were intended to and likely did deceive the consuming public for the reasons detailed herein.

25           91.     The above-described false, misleading, and deceptive advertising Defendant

26   disseminated continues to have a likelihood to deceive in that Defendant failed to disclose that the

27   Products contain substances that pose a significant risk to the health and wellbeing of animals, as

28   well as to the environment.

---

92.     Defendant continues to misrepresent to consumers that the Products were healthy when in fact the Products are not.

93.     In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law.  Plaintiffs and other Subclass Members based their purchasing decisions on Defendant's omitted material facts. The revenue attributable to the Products sold in those false and misleading advertisements likely amounts to tens of millions of dollars.  Plaintiffs and Subclass Members were injured in fact and lost money and property as a result.

94.     The misrepresentations and non-disclosures by Defendant of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute a violation of Cal. Bus. & Prof. Code § 17500, *et seq*.

95.     As a result of Defendant's wrongful conduct, Plaintiffs and Subclass Members lost money in an amount to be proven at trial.  Plaintiffs and Subclass Members are therefore entitled to restitution as appropriate for this cause of action.

96.     Plaintiffs and Subclass Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

## COUNT IV
### Fraud
### (On Behalf Of The Class And California Subclass)

97.     Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

98.     Plaintiffs bring this claim individually and on behalf of the Class and Subclass under California law.

99.     At the time Plaintiffs and Members of the Class and Subclass purchased the Products, Defendant did not disclose, but instead concealed and misrepresented, the Products as healthy.

100.    Defendant affirmatively misrepresented the Products, giving the Products the appearance of a product that is indeed healthy.

101.    Defendant also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon Defendant's representations (and corresponding omissions) in making purchasing decisions.

102.    Plaintiffs and Members of the Class and Subclass did not know—nor could they have known through reasonable diligence—about the true nature of the Products.

103.    Plaintiffs and Members of the Class and Subclass would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

104.    Plaintiffs and Members of the Class and Subclass had a right to rely upon Defendant's representations (and corresponding omissions) as Defendant maintained monopolistic control over knowledge of the true quality of the Products.

105.    Plaintiffs and Members of the Class and Subclass sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, thus causing Plaintiffs and Members of the Class and Subclass to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

**COUNT V**
**Fraudulent Concealment or Omission**
**(On Behalf Of The Class And California Subclass)**

106.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

107.    Plaintiffs bring this claim individually and on behalf of the Class and Subclass under California law.

108.    At all relevant times, Defendant was engaged in the business of designing, manufacturing, distributing, and selling the Products.

109.    Defendant, acting through its representatives or agents, delivered the Products to its own distributors and various other distribution channels.

110.    Defendant willfully, falsely, and knowingly omitted material and made partial representations facts regarding the quality and character of the Products as discussed throughout.

111.    Rather than inform consumers of the truth regarding the Products, Defendant misrepresented the quality of the Products as discussed herein at the time of purchase.

112.    Defendant made these material omissions and partial representations to boost or maintain sales of the Products, and to falsely assure purchasers of the Products that Defendant is a reputable company and that its Products are healthy.  The omitted information and partial representations were material to consumers because the representations played a significant role in the value of the Products purchased.

113.    Plaintiffs and Members of the Class and Subclass accepted the terms of use, which were silent on the true nature of the Products, as discussed throughout.  Plaintiffs and Members of the Class and Subclass had no way of knowing that Defendant's representations were misleading.

114.    Although Defendant had a duty to ensure the accuracy of the information regarding the Products because it was in exclusive knowledge of this information, the information pertains to matters of health, and Defendant did not fulfill that duty.

115.    Defendant misrepresented material facts partly to pad and protect its profits, as it saw that profits and sales of the Products were essential for its continued growth and to maintain and grow its reputation as a premier manufacturer and seller of the Products.  Such benefits came at the expense of Plaintiffs and Members of the Class and Subclass.

116.    Plaintiffs and Members of the Class and Subclass were unaware of these material misrepresentations, and they would not have acted as they did had they known the truth.  Plaintiffs', Class Members', and Subclass Members' actions were justified given Defendant's misrepresentations.  Defendant was in the exclusive control of material facts, and such facts were not known to the public.

117.    Due to Defendant's misrepresentations, Plaintiffs and Members of the Class and Subclass sustained injury due to the purchase of the Products that did not live up to their advertised representations.  Plaintiffs and Members of the Class and Subclass are entitled to recover full refunds for the Products they purchased due to Defendant's misrepresentations.

118.    Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs', Class Members', and Subclass Members' rights

and well-being, and in part to enrich itself at the expense of consumers.  Defendant's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competing products.  Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

**COUNT VI**
**Unjust Enrichment**
**(On Behalf Of The Class And California Subclass)**

119.     Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

120.     Plaintiffs bring this claim individually and on behalf of the Class and Subclass under California law.

121.     To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

122.     Plaintiffs and Members of the Class and Subclass conferred benefits on Defendant by purchasing the Products.

123.     Defendant was unjustly enriched in retaining the revenues derived from Plaintiffs', Class Members', and Subclass Members' purchases of the Products.  Retention of those monies under these circumstances is unjust and inequitable because Defendant failed to disclose that the Products were not healthy as advertised, rendering them unfit for their intended purpose.  These omissions caused injuries to Plaintiffs and Members of the Class and Subclass because they would not have purchased the Products if the true facts were known.

124.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and Members of the Class and Subclass is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a)     For an order certifying the Class and Subclass under Fed. R. Civ. P. 23 and naming Plaintiffs as representatives of the Class and Subclass, and Plaintiffs' attorneys as Class and Subclass Counsel;

(b)    For an order declaring the Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiffs, the Class, and the Subclass on all counts asserted herein;

(d)    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper;

(h)    For an order awarding Plaintiffs, the Class, and the Subclass their reasonable attorneys' fees and expenses and costs of suit.

### JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  November 17, 2023       **BURSOR & FISHER, P.A**.

By:    */s/ L. Timothy Fisher*
         L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
      ehorne@bursor.com

*Attorneys for Plaintiffs*

1

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

2

     I, L. Timothy Fisher, declare as follows:

3

     1.     I am an attorney at law licensed to practice in the State of California and a member

4

of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiffs.

5

Plaintiff Kueck resides in Bay Point, California.  Plaintiff Silver resides in San Jose, California.  I

6

have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could

7

and would competently testify thereto under oath.

8

     2.     The Complaint filed in this action is filed in the proper place for trial under Civil

9

Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred

10

in the Northern District of California, as Plaintiffs purchased the Products within this District.

11

Additionally, Defendant advertised, marketed, manufactured, distributed, and/or sold the Products

12

at issue to Class Members from this District.

13

     I declare under the penalty of perjury under the laws of the State of California and the

14

United States that the foregoing is true and correct and that this declaration was executed at Walnut

15

Creek, California this 17th day of November, 2023.

16

17

       */s/ L. Timothy Fisher*
        L. Timothy Fisher

18

19

20

21

22

23

24

25

26

27

28